UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | |
|---|---|
| HILARY GRUBBS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 4:19-cv-00211-SEB-DML |
| ) | |
| GROTE INDUSTRIES, LLC, ) | |
| ) | |
| Defendant. ) | |

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This cause is before the Court on Defendant's Motion for Summary Judgment [Dkt. 47], filed on October 7, 2020. Plaintiff Hilary Grubbs has brought this action against her current employer, Defendant Grote Industries, LLC, alleging that it discriminated against her because of her sex in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"). For the reasons detailed below, we GRANT Defendant's Motion for Summary Judgment.

**Factual Background**

The facts taken in the light most favorable to the Plaintiff, Hilary Grubbs, are as follows:

Defendant Grote Industries, LLC ("Grote") is a plastic injection molding company based in Madison, Indiana. They are in the business of making headlights, taillights, assemblies, and other items involved with vehicle safety systems. Ferrell Dep. at 18.

1

Grote employs over two hundred hourly employees and several salaried employees. Sauffer Dep. at 19.

Ms. Grubbs has been employed by Grote since March 1994. After working in several different positions throughout her time with the company, Ms. Grubbs completed a mold setter apprenticeship, became a full-time mold setter in 2015, and remains employed by Grote in this position. Grubbs Dep. at 12–13. There are approximately seven mold setters at Grote in addition to Ms. Grubbs, but Ms. Grubbs is the only female. Dkt. 1 at 2. Mold setters are responsible for setting up the machines that inject plastic into the molds, changing the molds, and filling out the requisite paperwork. Dkt. 48 at 2. The paperwork is an essential job function that includes a mold setter check list turned in after every mold change. Ferrell Dep. at 20.

**Reported Incident in February 2019**

On February 26, 2019, Grote suspended Ms. Grubbs for five days because she purportedly resisted instructions from her supervisor to place part numbers on a mold setter check list sheet on February 21, 2019. Dkt. 1 at 3. According to Grote, the suspension resulted from a conversation between Ms. Grubbs and her supervisor, Mr. Ferrell. Mr. Ferrell originally worked as a mold setter like Ms. Grubbs but had just been promoted to supervisor approximately two weeks before the reported incident. Ferrell Dep. at 14. As third shift supervisor, three mold setters reported to Mr. Ferrell: Hilary Grubbs (female), Brian Scroggins (male), and Isaac Jones (male). *Id.* at 26.

At some point shortly after starting as supervisor, Mr. Ferrell was given a directive by his superior, Mr. Schlatterer, the production leader for the second and third shifts, to

tell his third shift employees to start putting part numbers in addition to mold numbers on their mold setter checklists. *Id.* at 39–40. In response to this directive, Mr. Ferrell spoke to Ms. Grubbs on February 21, 2019, and informed her that she needed to start putting the part numbers on the checklists. Grubbs Dep. at 41. Ms. Grubbs and Mr. Ferrell differ in their recitation of the details of this conversation and in their overall characterizations of the interaction. They were the only two individuals present during the conversation. Ferrell Dep. at 49.

Mr. Ferrell contends that Ms. Grubbs was insubordinate in her response to his request to add part numbers to her mold setter check list. In an email from Mr. Ferrell to Mr. Schlatterer on the day after the incident, Mr. Ferrell stated that three times Ms. Grubbs expressly refused to fill out the part numbers on the checklist. Dkt. 49-7. He further alleged that she laughed in his face multiple times and said to him, "I bet you just love not having to do the work anymore don't you?" *Id.* In his email, he also reflected that he felt Ms. Grubbs had an issue with authority figures, had issues taking simple orders from management, and that she viewed anything asked of her by a supervisor as some form of punishment. *Id.*

Ms. Grubbs does not dispute that she had a conversation with Mr. Ferrell about the part numbers on the day in question. However, she does dispute that she expressly refused to follow Mr. Ferrell's directive, insisting that she simply made two jokes in response to his requests and never verbally refused to put the part numbers on the sheet.[1]

---

[1] In her deposition, Ms. Grubbs stated that her response to Mr. Ferrell's request was as follows: "I've seen how you fill out your check sheets, writing all over the sides and stuff, and all the

Grubbs Dep. at 41–42. Ms. Grubbs maintains that she never verbally said, "yes or no" in response to Mr. Ferrell's requests but noted that "he didn't seem receptive to my joke, no. I think I stepped on a nerve, because I poked at him." *Id.* She was suspended for insubordination based on this exchange.

According to Ms. Grubbs, the reason given for the suspension—insubordination—was a pretext. She contends that the real reason for the suspension was based on upper management's desire to terminate her because of her sex. *See id.* at 40. This belief stems from her testimony about another conversation she had had with Mr. Ferrell a "couple weeks" prior to his becoming her supervisor in which he told her that his supervisor—Mr. Schlatterer—had told him she "was a troublemaker," and that he was going to try and have her fired before Mr. Ferrell became her supervisor. *Id.* She also stated that Mr. Ferrell had characterized Mr. Schlatterer's comments as "being very sexist" when he relayed the substance of the conversation to her. *Id.* Mr. Ferrell disputes the substance of this conversation and denies that Mr. Schlatterer ever told him that Ms. Grubbs was a troublemaker or that he wanted to fire her. Ferrell Dep. at 37–38. He also denies that he told Ms. Grubbs that he believed Mr. Schlatterer was sexist. *Id.*

---

extra stuff that go – that you put on it. And he said, We were made to do that. And I said, We were never told we had to do that. He said, Well, we had to. He – and he cut me off. He said, Come to the computer and I'll show you exactly what I have to put on the spreadsheet that I send to Steve or Roger . . . So he pulls it up on the computer, and he shows me where he puts the parts numbers in. And he reconfirms that he needs me – it wasn't a question – reconfirms that he needs me to start putting the parts numbers on. And I made a joke, and I said, I guess I'll have to stop putting in so many mold setter check sheets. I'll have to do less of them. That was a joke. I didn't refuse. I wasn't mean about it. I didn't raise my voice." Grubbs Dep. at 41–42.

Grote maintains that Ms. Grubbs's suspension was based on her insubordination in response to Mr. Ferrell's directive, not her failure or refusal to fill out the part numbers on the check list. However, Ms. Grubbs believes the reason given for her suspension was pretextual because other similarly situated male mold setters were never disciplined for failing to put part numbers down, even though they were directed to do so, and this failure to put the part numbers down also constituted "insubordination" without management taking any type of disciplinary action against them.

**Disciplinary Action**

Grote's Employee Conduct and Work Rules prohibit "[w]illful disobedience, insubordination, or failure to carry out any reasonable order." Dkt. 49-6. There is no definition of "insubordination" in Grote's Code of Conduct or any relevant policies. Wilber Dep. at 22. The definitions of "insubordination" provided by management included (1) Mr. Ferrell's definition of insubordination as "not doing what's asked of you," (2) the Director of Human Resources, Mr. Wilber's, definition as a "refusal to perform . . . a reasonable duty requested by a member of management" and a refusal to "do a task within [a] job description when directed by a member of management," and (3) the plant manager, Mr. Sauffer's, definition of insubordination as a direct refusal to do a job. *See* Ferrell Dep. at 36; Schlatterer Dep. at 27–28; Wilber Dep. at 22–23.

Mr. Ferrell did not have independent authority to suspend any employee. Ferrell Dep. at 18. He emailed his synopsis of the events that took place to his supervisor, Mr. Schlatterer, who in turn forwarded the email to Grote management. Management relied on Mr. Ferrell's account of the events, without conducting an independent investigation

or speaking to Ms. Grubbs individually about the conversation that took place with Mr. Ferrell. Sauffer Dep. at 34–35; Schlatterer Dep. at 41; Wilber Dep. at 30–31. Mr. Schlatterer convened a suspension meeting attended by himself, Ms. Grubbs, Mr. Ferrell, Mr. Judge (union steward), and Mr. Wilber. Wilber Dep. at 44–45. This meeting was terminated almost immediately when Mr. Judge stated that he did not feel comfortable being there because the meeting was not being held in accordance with the appropriate collective bargaining procedures. *See id.* at 46. The meeting was reconvened shortly thereafter without Mr. Judge or Mr. Wilber present.[2] The reconvened meeting included only Ms. Grubbs, Mr. Ferrell, Mr. Schlatterer, and Mr. Brent Colber, who was added based on his roles as an employee at Grote and a bargaining member of the union.[3]

      Mr. Schlatterer did not possess the necessary independent authority to issue a suspension or terminate an employee without management's approval. Schlatterer Dep. at 15–16. Therefore, Mr. Sauffer, the plant manager, made the final suspension decision with regard to Ms. Grubbs. Although the meeting was purportedly scheduled to receive Ms. Grubbs's side of the story and discuss the incident, Mr. Schlatterer testified that the suspension decision had been "made before I walked in the door" and thus he simply

---

[2] Mr. Wilber testified that, "at that point we felt that it was still necessary to move forward because we had provided her representation. The representative did not do their job in staying in the meeting and listening as they were supposed to. And so we decided to try to get another member of the union, who used to be a steward at one point, because they would know what to listen for and take notes of." Wilber Dep. at 47.

[3] The Collective Bargaining Agreement (CBA) between Grote and the Union had provisions requiring management employees to notify an employee of her right to union representation when any type of disciplinary action was being issued to him or her. A union representative under the CBA is usually a member of the union committee or a designated union steward. Wilber Dep. at 18.

presented the suspension decision letter to Ms. Grubbs at the meeting. Schlatterer Dep. at 59–62. Ms. Grubbs had received no previous formal disciplinary citations in her file at any time prior to the incident in question, other than attendance violations. Wilber Dep. at 55.

Ms. Grubbs filed a union grievance regarding the five-day suspension she received, and, at a subsequent hearing, Grote denied the grievance. *Id.* at 51–53. Instead of moving forward to arbitration, the Union requested that her suspension be reduced to a written warning, and Grote agreed to reduce the suspension to a written warning in order to settle the matter. *Id.* at 57–58. Grote also agreed to pay Ms. Grubbs's back pay for the five-day suspension.[4] *Id.*

Ms. Grubbs concedes that the specific reason behind her suspension was insubordination, not a failure to put part numbers down on the mold setter checklist. Nevertheless, she disputes the legitimacy of this reason, citing the fact that she was not insubordinate because her responses to Mr. Ferrell were just jokes.

**The Instant Litigation**

After filing a charge of sex discrimination with the Equal Employment Opportunity Commission ("EEOC") and receiving her notice of right to sue from the EEOC, Ms. Grubbs filed her complaint in this Court on October 7, 2019, alleging, *inter alia*, that she was suspended because of her sex, in violation of Title VII. Defendant filed

---

[4] It is unclear what Ms. Grubbs's damages claim would be in light of Grote's decision to drop her suspension down to a written warning and award her full backpay for the entire five days during which she was suspended, were this case to proceed beyond summary judgment.

this motion for summary judgment on October 7, 2020. That motion is fully briefed and ripe for ruling.

## Legal Analysis

### I. Standards of Review

#### A. Summary Judgment

Summary judgment is appropriate where there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A court must grant a motion for summary judgment if it appears that no reasonable trier of fact could find in favor of the nonmovant on the basis of the designated admissible evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). We neither weigh the evidence nor evaluate the credibility of witnesses, *id.* at 255, but view the facts and the reasonable inferences flowing from them in the light most favorable to the nonmovant. *McConnell v. McKillip*, 573 F. Supp. 2d 1090, 1097 (S.D. Ind. 2008). Neither the mere existence of some alleged factual dispute between the parties, *Anderson*, 477 U.S. at 247, nor the existence of some metaphysical doubt as to the material facts, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Illinois, Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Thus, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact finder could find for the

party opposing the motion, summary judgment is inappropriate. *See Shields Enter., Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992). If it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish her case, summary judgment is not only appropriate, but mandated. *See Celotex*, 477 U.S. at 322; *Ziliak v. AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir. 2003). Further, a failure to prove one essential element necessarily renders all other facts immaterial. *Celotex*, 477 U.S. at 323.

### B. Employment Discrimination

Plaintiff's sex discrimination claim must satisfy the pleading requirements set forth by the Seventh Circuit's decision in *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016) in order to survive the pending motion for summary judgment. *Ortiz* provides that regardless of whether the court uses the burden-shifting analysis of *McDonnell Douglas* or some other framework to evaluate a plaintiff's employment discrimination and retaliation claims, "the ultimate legal question 'is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action.'" *Reed v. Freedom Mortg. Corp.*, 869 F.3d 543, 547 (7th Cir. 2017) (quoting *Ortiz*, 834 F.3d at 765). Under this "simplified" approach, the "[e]vidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence." *Ortiz*, 834 F.3d at 765.

Here, after careful review of the record, we find that Ms. Grubbs has failed to adduce sufficient evidence, when viewed as a whole, to create a triable issue as to

9

whether her suspension was motivated by the gender-based discriminatory intent of Grote's supervisory employees. There is no direct evidence—no "smoking gun"— showing that Grote's suspension decision was based on Ms. Grubbs's sex. Thus, we look to see if there is any circumstantial evidence to support such a claim. The Seventh Circuit recognizes three types of circumstantial evidence on which a plaintiff may rely "to provide a basis for drawing an inference of intentional discrimination." *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994). Such evidence includes: "ambiguous or suggestive comments or conduct; better treatment of people similarly situated but for the protected characteristic; and dishonest employer justifications for disparate treatment." *Joll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 929 (7th Cir. 2020) (quotation marks and citation omitted). Each type of evidence may be "sufficient by itself (depending of course on its strength in relation to whatever other evidence is in the case) to support a judgment for the plaintiff; or they can be used together." *Troupe*, 20 F.3d at 736.

Ms. Grubbs cites as evidence in support of her claim Mr. Schlatterer's alleged sexist comment to Mr. Ferrell and that he wanted to try to get Ms. Grubbs fired. Ambiguous or suggestive remarks "may be direct or circumstantial evidence of intentional discrimination if they are sufficiently connected to the employment decision, i.e., made by the decision maker, or those who influence the decisionmaker, and made close in time to the adverse employment decision." *Dandy v. United Parcel Service, Inc.*, 388 F.3d 263, 272 (7th Cir. 2004) (citing *Troupe*, 20 F.3d at 736). Assuming that Mr. Schlatterer's remarks were, indeed, made in the manner that Ms. Grubbs has recounted

10

them, there simply is no connection between them and the decision to suspend her employment. As such, they do not constitute circumstantial evidence of intentional discrimination on the basis of Ms. Grubbs's sex that caused or resulted in her suspension.

The statements allegedly made by Mr. Schlatterer, rather than referencing her gender, related to Ms. Grubbs's troublesome behavior as an employee. The only reference to sex was Mr. Ferrell's second-hand characterization of Mr. Schlatterer's remarks as "sexist," which occurred well in advance of the insubordination. The record is devoid of any report of what Mr. Schlatterer actually said about Ms. Grubbs. In fact, Mr. Schlatterer and Mr. Ferrell deny that these words were spoken. As we have noted, Mr. Ferrell, who had no independent authority to issue discipline, sent his account of the incident via email directly to Mr. Schlatterer, who then passed the information up the chain of command of Grote's management. Mr. Schlatterer's role in the disciplinary action was limited to transmitting the incident report from Mr. Ferrell to the management committee, who then independently made the final disciplinary decision. There is no evidence that Mr. Schlatterer made any recommendation as to the appropriate discipline of Ms. Grubbs. Schlatterer Dep. at 17. After the management committee decided to suspend Ms. Grubbs, Mr. Schlatterer presented the final suspension letter to her at the subsequent meeting, noting that the decision had already been made at that point and that he had no part in drafting the letter. *Id.* Whatever comments he may have made to Mr. Ferrell at some point in the past regarding Ms. Grubbs or views towards her, they played no role in her suspension. Thus, the evidence falls well short of establishing intentional discrimination by Grote on the basis of Ms. Grubbs's sex. The evidence unequivocally

11

establishes that neither Mr. Ferrell nor Mr. Schlatterer was involved in the final suspension decision, beyond Mr. Ferrell's factual report of her insubordination. *See Dandy*, 388 F.3d at 272.

Ms. Grubbs attempts to find support for her claim based on the differing definitions of insubordination provided by Grote's representatives as evidence of pretext. We begin by noting that we do not find a material difference between or among these definitions, and certainly not a variance that is relevant here. To demonstrate pretext a plaintiff must show "such weaknesses, implausibility, inconsistencies, or contradictions in [the employer's] proffered reasons that a reasonable person could find them unworthy of credence and hence infer that [the employer] did not act for the asserted non-discriminatory reasons." *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007). "In determining whether an employer's stated reason [for disciplinary action] is pretextual, '[t]he question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered to explain the [disciplinary action].'" *Harper v. C.R. England, Inc.*, 687 F.3d 297, 311 (7th Cir. 2012) (quoting *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011)). "Pretext involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is [a] 'lie, specifically a phony reason for some action.'" *Argyropolous v. City of Alton*, 539 F.3d 724, 736 (7th Cir. 2008) (quoting *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 737 (7th Cir. 2006)).

Ms. Grubbs contends that the variations among Grote's supervisory personnel in defining "insubordination" points to pretext, in an effort to hide the fact that the real

reason for suspension was her gender. But, in truth, the only evidence of any gender related fact or circumstance is that Ms. Grubbs is a woman. Being a woman does not protect her from a charge of insubordination, assuming such insubordination has been proven. Although there is no formal definition of "insubordination" in Grote's Code of Conduct or any relevant policies, [Wilber Dep. at 22], the members of Grote's management team provided definitions of what they believed constituted "insubordination." We find these definitions sufficiently similar to support the characterization of Ms. Grubbs's responses to Mr. Ferrell as insubordination. Ms. Grubbs never denies having committed the acts which were construed as insubordination by her supervisors. She maintains that her attempt at humor in her rejoinder to Mr. Ferrell was misinterpreted and overreacted to, but she stops short of claiming that management's overreaction and misinterpretation were themselves evidence of discrimination.

Ms. Grubbs cites to the lack of disciplinary action taken by Grote with respect to similarly-situated male mold setters who repeatedly failed to put part numbers on their check lists after being instructed to do so as additional evidence of pretext. However, Grote maintains any difference in treatment was not because the men in question failed to put down the required part numbers, but because these male employees were not insubordinate in response to the request that they do so. We emphasize: the failure to record part numbers was not the basis for Ms. Grubbs's suspension; it is thus not relevant whether the male mold setters failed to record the part numbers.

Ms. Grubbs also has presented evidence of another Grote employee, Mr. Caldwell, who was suspended for insubordination for only three days, after causing damage to

company equipment and refusing a post-accident drug / alcohol test, in an attempt to show that the length of her suspension was disproportionate vis-à-vis this comparator. This employee clearly is not comparable to Ms. Grubbs in all material respects, namely, because he was not a mold setter and did not report to Mr. Ferrell. *See Cung Hnin v. TOA (USA), LLC*, 751 F.3d 499, 504 (7th Cir. 2014). Even if Ms. Grubbs's five-day suspension were disproportionate compared to Mr. Caldwell, the uncontroverted evidence establishes that the disciplinary action taken against her was based on her insubordination, not on her gender. *See also Gordon v. United Airlines, Inc.*, 246 F.3d 878, 890–91 (7th Cir. 2001) ("It is not the province of this court to question an employer's decision to punish some conduct more harshly than other conduct.").

     Finally, Ms. Grubbs attempts to raise a new "cat's paw liability theory" in her opposition brief to this motion. To succeed under this theory of liability, Ms. Grubbs must show that a biased subordinate who lacks decision-making authority used a "formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *Grant v. Trustees of Indiana University*, 870 F.3d 562, 570 (7th Cir. 2017) (quoting *Nichols v. Michigan City Plant Planning Dept.*, 755 F.3d 594, 600 (7th Cir. 2014)). Ms. Grubbs contends that Mr. Ferrell was the cat's paw who "duped" Mr. Sauffer and Mr. Wilber into suspending her for gender related reasons. However, Ms. Grubbs has presented no evidence to establish that Mr. Ferrell harbored any discriminatory animus toward her. The formal decision-makers, Mr. Sauffer and Mr. Wilber, suspended Ms. Grubbs because of her reported insubordinate response to a directive issued by her

supervisor, not because of a "deliberate scheme" to suspend her because of her sex. As a result, this theory offers no support to her claim.

Ms. Grubbs's Title VII claim cannot survive summary judgment because the evidence fails to establish that her suspension for insubordination was related either directly or indirectly to her gender. No evidence, even when viewed as a whole, would support an inference that her suspension was the result of impermissible sex discrimination.

### C. Punitive Damages

Grote has also sought summary judgment on Ms. Grubbs's request for an award of punitive damages, if it were not found to be the prevailing party on this motion. We shall rule on the punitive damages issue, even though it is now moot. Punitive damages are available under Title VII if a plaintiff establishes that the defendant "has engaged in intentional discrimination and has done so 'with malice or with reckless indifference to the federally protected rights of an aggrieved individual.'" *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 529–30 (1999) (quoting 42 U.S.C. § 1981a(b)(1)). The designated evidence must demonstrate that the defendant has engaged in some "egregious" misconduct. *Id.* at 534. In other words, it must be established that Grote was "motivated by evil motive or intent, or . . . involve[d] reckless or callous indifference to the federally protected rights of others." *Id.* at 536. Additionally, an employer may not be held vicariously liable for the discriminatory actions of its managerial agents in circumstances where it can show that such actions are contrary to the employer's "good faith efforts to

comply with Title VII." *Kolstad*, 527 U.S. at 545 (internal quotation marks and citation omitted).

Grote cites its good faith efforts to comply with Title VII by implementing its anti-discrimination policy which prohibits harassment and discrimination and establishes and specifies the procedures for employees to report any incident of harassment or discrimination. Ms. Grubbs never filed any report of alleged discriminatory comments or alleged instances of harassment or discrimination to Grote's Human Resources Department. Grubbs Dep. at 47–48. Further, she has presented no evidence that she was unaware of Grote's policy or unaware of how to report any instances of discrimination. There is, thus, no evidence that Grote failed to adhere to its anti-discrimination policy or engaged in intentional gender-based discrimination with malice or reckless indifference to Ms. Grubbs's federally protected rights. Therefore, punitive damages would not be available, if the substantive allegations had succeeded.

## II. CONCLUSION

For the reasons provided, Defendant's Motion for Summary Judgment [Dkt. 47] is <u>GRANTED</u>. Final judgment shall issue accordingly.

IT IS SO ORDERED.

Date: 9/23/2021

_Sarah Evans Barker_
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Daniel P. Dietrich
GUNSTER, YOAKLEY & STEWART, P.A.
ddietrich@gunster.com

John H. Haskin
JOHN H. HASKIN & ASSOCIATES, LLC
jhaskin@jhaskinlaw.com

Greg S. Morin
MONTGOMERY, ELSNER & PARDIECK, LLP
gmorin@meplegal.com

Jounice L. Nealy-Brown
GUNTER, YOAKLEY & STEWART, P.A.
jnealy-brown@gunster.com

Eduardo A. Suarez-Solar
GUNSTER, YOAKLEY & STEWART, P.A.
esuarez@gunster.com

Bradley L. Wilson
JOHN H. HASKIN & ASSOCIATES, LLC
bwilson@jhaskinlaw.com